JDA Software Group, Inc. Good morning. May it please the Court, Jennifer McDonald on behalf of the Appellant Plaintiff Retail Pipeline. This appeal and the District Court's decision concern really the fundamental rules of contract interpretation and the standard by which a district court must adhere at the summary judgment stage. It's important to note at the outset that my client was not the moving party on the summary judgment motion and lost, so all inferences should have been construed in my client's favor. In this situation, the contract claims concern breach of the total consideration that was due under a performance earn-out provision. And your position is that under that contract, this roadmap was incorporated by reference. Is that right? No, I think my position is a little bit different. The position is not, the roadmap itself is not a contract that the parties executed. It is extrinsic evidence. This is, so this goes back to the ambiguity of the term Flowcasting 2.0. What exists to define that term? That is extrinsic evidence to define the term Flowcasting 2.0 or similar product. So the parties met. Is there, what is the contention of, I mean, the obligation is to pay, I'll call them royalties, that's probably not the technically correct term, to pay as a sum for every sale of Flowcasting 2.0 or similar product. What is the similar product that, on which they did not pay royalties? I think both of those statements that you just made, Your Honor, Flowcasting 2.0 or similar product, are, the parties dispute what that means. Okay, fine. So you tell me, what is it that it means? Under what interpretation of what it means, was there something sold on which a royalty is owed? Flowcasting 2.0 was never created. What it should have been... Okay, so the question then is, what, if you're not contending that they failed to pay on Flowcasting 2.0 or similar product, what is there in the contract that obligates them to create a similar product or Flowcasting 2.0? Just to be clear, I am contending that they failed to pay on Flowcasting 2.0 or similar product because it was not created. Well, wait, wait, wait, no, no, no. That's a bit of a jump, isn't it? Because the contract says, for certain kinds of products we're going to pay one thing, for other kinds of products we're going to pay another. For Flowcasting 2.0 or a similar product, we're going to pay something else. And you just told me there is no Flowcasting 2.0 or similar product. So where does there become an obligation on them to pay something? Then that would write this term completely out of the total consideration of the contract. Right. They did actually pay some things, didn't they? They paid something under Revenue Stream 2. I think there's a factual question. How much of a similar product it is because they put a name... Are you saying that this contract says that they must pay under, or at least can be read as saying that they must pay for Flowcasting 2.0 or similar product, and therefore that they have a duty to do it? That it is ambiguous in that sense that since it says that they must pay under that, that that necessarily implies a duty, or at least is ambiguous as to whether it implies a duty. Is that your argument? I think if I understand you correctly, that is the argument. Total consideration is defined to include two different categories, and similar to Your Honor's security plan case, the distinction from that case is that this is an ambiguous calculation for a performance obligation. I understand why it's ambiguous. If I license from a company the rights to produce a board game, Monopoly, and I agree that I'm going to pay a royalty back for every unit that I sell, why does that obligate me to keep producing Monopoly indefinitely rather than say this has been selling very well, so thank you very much, but I'm giving you zero this year because we stopped making Monopoly. What is there that makes that a requirement that... I mean, you would think it would be something to say explicitly that you have to actually produce this or keep doing this, and there's a revenue stream from Flowcasting 1, right? There's a revenue stream for Flowcasting 1.0 for the legacy product. Yeah, so does that mean that they're obligated to keep selling Flowcasting 1? Suppose they said, look, sorry, Flowcasting 2 isn't working out. We'll try to sell Flowcasting 1 for a while. If it doesn't work, we'll stop selling that. Would that be a breach of this agreement? We took, when we entered into it, we took them at face value that they did not intend to sell Flowcasting 1.0 other than the two carve-outs in there. If they had refused to sell to the two Flowcasting 1.0 carve-outs, then that would have been a breach, and back to your honors, and I think it's a good question and it's a discussion, there is no carve-out in this agreement that says they don't have to do that, and again, back to the security plans, that case involved a specific provision which doesn't exist in this contract, and that was an unambiguous contract. That case involved a specific provision that said defendant in that situation was under no obligation to maximize the revenue that would be used to calculate the earn-out payment, and in that case, this court remanded on the implied covenant claim, saying even if you carve out a statement in a calculation for an earn-out that says we're under no obligation to maximize it. I'm coming back to this. I'm perfectly willing to accept the notion that terms like Flowcasting or similar products are ambiguous, but what I still don't understand is where the ambiguity is as to the duty to do those things which are ambiguous, and that's my question. If you can convince me that somehow there is an ambiguity as to the duty to do those, then I think one has to get to external evidence. The other side suggests external evidence that there is a duty, but that's external evidence when they say we tried, but what is there that suggests that external evidence that that is an ambiguous question as to the duty? Again, what this, and I think the significance of this, what makes it material to get to both your question, Your Honor, and the district court? The fact that another product is mentioned is itself ambiguous as to whether there is a duty to produce it, is that your argument? In other words, if somebody says, I will give you royalties on a banana product, and I will give you more royalties on Monopoly, you're saying that that fact suggests at least ambiguously that I have a duty to produce Monopoly? I'm not sure I understand. The party's intent about, under the express language of this contract, the intent about whether or not this was going to be made, I think you could argue, is ambiguous. Our position is you start with, we've got a term that's in the total consideration paragraph. What in the contract suggests that there is a duty to do something specific about forecasting towards or similar products? Because we will pay you based on the performance of this product. Yeah, but they're licensing an underlying technology here, and they're saying if we use that technology, your technology, and we make money at it, we'll pay you. That doesn't say anything about we're obligated to produce something and then try to sell it if we determine that the technology doesn't work or whatever. I don't see what in this contract gives any ambiguity about whether there's an obligation to produce this. The contract just says, we will pay you a revenue stream on anything that is similar to forecasting 2.0, whatever that means. Now, there's certainly plenty of ambiguity about what flowcasting 2.0 means or what would constitute a similar product, but you are not suggesting that that ambiguity makes any difference. You're not suggesting that there is something that should have been called flowcasting 2 but wasn't. You're not suggesting that they made a similar product and they pretended it wasn't similar, and that's what the dispute is about, and therefore, we'd need to understand what the parties meant by flowcasting 2 or similar product. The issue isn't the ambiguity of what those terms mean. The issue is you're saying that the absence of any explicit provision that they are obligated to make something that would be similar to whatever flowcasting 2.0 means in itself creates an ambiguity as to whether there is or isn't an obligation to do that. I disagree. Your Honor started this by saying this contract says something to the effect of, if we make it, there are no conditions. We will pay you on flowcasting 2.0 or a similar product, but nothing says there has to be a similar product. Nothing says we are undertaking to use our best efforts to create flowcasting 2.0. Nothing is saying we have an obligation to make something like flowcasting 2.0 within the lifetime of this revenue stream, and it seems to me you have a very interesting case if you said, look, they deliberately slow-walked the creation of flowcasting 2.0, and then as soon as they were no longer under the temporal obligation to pay us, then they released Stratocasting 1.9, which is nothing other than what is a similar product to flowcasting 2.0. But then there's no indication of any of that. They just decided not to do this at all, as far as the evidence seems to say, right? No, it doesn't. And I'll go back to, they did not create what we call flowcasting 2.0. They worked on a product. A similar product. Perhaps. And did they sell any of it? Did they owe you royalties on it? They don't owe us royalties for what was generated, but they did not, and this gets to, again, I think the security plan. Where in the contract is there language that is ambiguous as to their duty to do this creation? There is no, what, the meaning of flowcasting 2.0 and what the duty with respect to that part is the ambiguity. That's ambiguous, but I come back to saying, that's fine, that's ambiguous, but where is their duty for them to do something about moving to, flowcasting to a similar product? What language, what, anything in the contract that would be ambiguous as to whether they have to do it? Can you point me to it? I'm sympathetic, but I'd like to... There's no, the contract is silent on the efforts that are required to be undertaken. There is no carve out for JDA to not do it, and there, as Your Honor has pointed out, there is no express statement in here that says you have to do it to our specifications. It's silent, and on that, it's ambiguous, and I think we get to the extrinsic evidence... I don't understand. Why is the absence of an affirmative duty to do something an ambiguity as to whether there is an affirmative duty to do something? How can that be? To pay us the consideration that we're due under the contract. But the consideration is the payment of royalties on the sale of certain items. Those items never came into existence, so where is the duty on them? I understand. If they used your technology and made something and made money on it, they're supposed to pay you. But where is there an obligation or what language could be construed as they're actually obligated to use their best efforts to create something that would fall within this description and would be commercially viable in such a way that you would be owed something. I think this gets to perhaps the implied covenant claim that again was discussed in the security plan case where even where there's a carve-out that they don't have to take those steps, there's still an obligation on behalf of a defendant when it purchases technology to not act arbitrary and irrationally in... What's arbitrary and irrational about deciding not to go forward with a rather complex enterprise to try to create something when, I mean, they presumably, they did do something, they met with you, they talked about these things, they had consultations, and then at some point they decided not to go through with it. How are you hurt by that? I don't understand. Because the deal is pay on a product. They've licensed the right to use your technology to make something. It doesn't say they have to actually go through with it, does it? And that must happen all the time in this industry, that somebody buys an idea and then it either does pan out and everybody gets rich, or it doesn't, and nobody makes any money. Arguably then you have a contract provision that says we have no obligation to do anything with your product. And here it simply says we will pay you revenue based on this product. It wouldn't have been a simple matter to put in something that says, you know, and there's an obligation to use your best efforts to create, to make something of this. Best efforts is a different issue, respectfully, entirely. Why is there, well, an obligation to use half-hearted efforts? An obligation to do something, to try to make a product? What would be the language that, what is the language that you are saying we should read into this contract? Well, I think that it should be read into this contract the same effort that should be in any contract, which is Norway. Or even language that says we are buying this product in the contract because we intend to produce, and then intent to produce might be ambiguous as to whether we have a duty to do it. And I don't even find that language. That language is not in here. It's simply we will pay you revenue based on a product. They didn't carve out any exception. They didn't carve out any statement saying we have no obligation to you to make it. Why then because of the affirmative obligation to create the product? And I think that's where the use of the term we believe is ambiguous because we, and there is no extrinsic evidence to this point, but we entered the contract believing they would make this product. They hired Mr. Landvater. They subsequently fired him for no reason in our position, but they hired him to help move this forward and made decisions, which again to the applied covenant claim we believe are arbitrary and irrational based on one hand not talking to the other, and intent by a vice president to effectively remove this product from the marketplace for competitive reasons. So it's arbitrary and irrational because a rational person in their position would have known that they could make a lot of money by doing this, and they still didn't do it because they were spying you because they didn't want to pay you your share of the money that they would have made if they had gone ahead with this. It's arbitrary and irrational for them to decide this isn't something we want to do anymore. I don't believe that was exactly the decision. So what is it that they did that was arbitrary and irrational? So going back to the beginning of why they wanted this product, they had several options and they chose we're going to do this and create a new product. Now at that point in time we do think that there was an intent to create a new product, but there was also an intent to remove our product from the marketplace. They get into this contract and after my client starts saying you're not giving us resources that we need to do what we agreed to do, and again this is looking at the extrinsic evidence, there was a whole conversation in December of 2013 which the parties talked about what was going to be agreed to. The CEO says that's all we were talking about for a year. We knew what this contract was about. This contract from the CEO of JDA's position was all about Flowcasting 2.0 just as it was from ours. My client starts to say you're not giving us the resources that we need to make the changes and they remove him from his position and put him in another group where he was not in a position to make any of those changes. He continues to advocate for the changes and he's ultimately fired. And before the earn-out period expires, they remove other prime people from their roles and move them to other projects so that we cannot realize the full benefit of the earn-out payment under the contract. So again, looking at the implied covenant, I do think this case in that respect in security plans was cited in JDA's brief, but in reviewing it, I think it's very applicable to the situation on the implied covenant claim. The distinction for the contract claim in that case was that it was an unambiguous calculation versus the ambiguous calculation we have. Thank you. I request that you remand for trial. Good morning. May it please the Court. My name is Justin Barnard. I'm counsel for Applea's Blue Yonder and Blue Yonder Group, which have been referred to throughout these proceedings as JDA, which is its prior name. I think what's possibly most notable about this contract dispute is, as has come out in the questioning today, what a fundamental disconnect there is between retail pipelines' claims of breach of contract and the actual text of the agreement that the parties executed. They are effectively bringing suit for breach of obligations that the parties never agreed to. They tried at length to get JDA to— That's extremes of evidence. I agree with you, Judge Calabresi. Don't give me extremes of evidence unless you admit that there is an ambiguity. If you start giving me extremes of evidence, then I'm going to start listening to their extremes of evidence on that one. So just don't give me that. I appreciate that, Judge Calabresi. Let me say that as to the breach of contract claim specifically, you don't need to look to extremes of evidence. The contract is clear. It's a very simple earn-out contract. And as was clear from the questioning of Ms. McDonald, there's no affirmative obligation in the contract to develop any product. Mr. Barnard, it's your point that when the conversation turns from the breach of contract to the breach of an implied obligation, under Delaware law, we do look to what is a kind of extrinsic evidence of negotiating history because under Delaware law, the breach of an implied covenant cannot be used for the purpose of inserting into a contract something that was declined during the negotiations. Is that the distinction that you're making for how we can and can't use extrinsic evidence here? That is exactly so, Your Honor. And the Delaware Supreme Court has been clear that when there is a claim of the breach of the implied covenant, it, in fact, invites review of the parties' course of dealing and their negotiations. Then we should look to their description of the course of dealing, of course, the negotiations, to see whether there is an implied covenant. And I'm interested that she never made any argument of that sort, but of whether the implied covenant thing under Delaware law, which does say you should look to what went on, then shouldn't we look to the things that opposing counsel is telling us to look at? Well, Your Honor, we have sworn testimony from one of Retail Pipeline's two principals,  They asked for a commitment to develop specific product features. They asked that those features be completed and merged within a year. They asked that the earn-out not start until they had a product that they felt would give them a chance for success. And he testified under it that JDA did not agree, and it proceeded in sign notwithstanding that.  This is Mr. Martin's testimony and question. And you signed the ultimate contract with no guarantee that these features would be included, correct? Answer is yes. And I said that earlier, and I'll repeat it. It's not because we didn't ask, but they came back and said we can't put that in the contract. And then he further testifies that he suggested to Landvater, the other principal, that they insist on a provision that if the full earn-out wasn't reached in the term, the set term, the parties could come back and negotiate. And Landvater said no, JDA already refused to pay the full amount of the revenue if those goals were not met. So, I mean, that's what their version is, or at least what their principal has acknowledged. That is what their principal has acknowledged. And Delaware has defined its implied covenant of good faith and fair dealing very narrowly. And it has been clear that it only will function to impose new obligations to fill a contractual gap where the parties, it's not that they didn't consider something at the time they were contracting, it's that they could not have anticipated the circumstances that transpired later. Here we have a circumstance where the principal, one of the principals of retail pipeline says, yeah, we discussed these issues. We tried to get them to agree to develop a product that we thought was best situated to take advantage of this commercial opportunity. I'll tell you what my problem with Delaware law is. There's plenty of language, exactly as you say, and there are plenty of cases where it's a practical matter. In that case, they found an implied covenant was reached. So, to the point of cases going every which way, maybe even somebody who loves to certify as much as I don't know what we'd be certifying because they're deciding case by case. So, perhaps most simply under Delaware law, if there's a gap, you're talking about a gap that's left by a rejected term, and the extrinsic evidence shows that this was something the parties didn't have thought about and didn't mention contract. Delaware's law is pretty clear. It doesn't imply covenant of good faith. It doesn't imply that that was the institution that was rewriting the contract that the parties did not express or did not reach in the bargaining table. That's exactly right, Judge Wilkinson. And I would, in responding to Judge Calabresi's comment about the Delaware jurisprudence on this issue, I think if you look at the cases cited in our papers, there's one Tenth Circuit case that the appellant has relied on heavily. But the Delaware cases on this issue, on the obligations under the implied covenant, are fairly closely in line over the last 15 years at least. In a line of cases, they have defined the implied covenant narrowly. They have said that where the parties could have anticipated an issue, even when the result is quite harsh, that they are going to impose and enforce a contractual bargain that the parties made, not the one that the losing party or the party who is dissatisfied wish they had made and were unable to do so. I would draw your attention as well to Delaware law on the question of the duty to maximize a selling party's earn-out, because this is essentially what this case is. The appellant says that JDA did not do enough to bring a product to market and give them a chance to completely earn their earn-out. And going back to some of the factual questions that arose during my colleagues' questioning, there actually was a JDA Flowcasting product that was developed. It was announced in April 2014. They marketed it. They sold it. They credited that revenue towards the earn-out. So this is exactly how the earn-out contract was supposed to function, and that is undisputed. They just dispute whether the product that was sold had all of the features that they felt were necessary to qualify as Flowcasting 2.0. But to go back to my original point, where the contention is that JDA did not do enough to allow retail pipeline to complete the earn-out, the Delaware Supreme Court has said unambiguously that absent some contractual guarantee of best efforts, after some post-closing obligations that address this issue, it is not the role of the implied covenant of good faith and fair dealing to step in and require a purchasing party to exercise some specific level of efforts, take any specific actions to maximize the selling party's earn-out. If your honors have no further questions, I'll yield the rest of my time. We'd ask that you affirm. Thank you. Thank you. I do want to address the implied covenant claim, which is a part of this appeal. And that certainly is something we addressed in our briefing. I think the Tenth Circuit case on our tools, because it deals with an earn-out provision, it deals with the implied covenant claim, is very similar here. This is not a situation, I want to draw a distinction between what was requested by my clients before the contract and what was not requested because they did not think that this would ever be an issue. What was requested in October of 2013 was very specific items of the software that was going to be created. What was not requested was a provision that says we are going to make the software because we did not, because as looking at extrinsic evidence and if we're talking about the implied covenant claim, we do have to kind of weigh what the parties thought about beforehand. As the CEO for JDA said, and this is quoted in the briefing, this is all we were talking about for a year. We thought it was understood. You suggested earlier that this was a plot by JDA to get you off the market, and they never had any intention of marketing anything that would look like Flowcasting 2.0. Can you point me to some evidence of that intent? That's a little more extreme than what I meant to suggest, so I apologize for that. The intent was certainly to remove us from the marketplace because we were a competitor, so they did not want us hanging out there competing with their product. We have not made the claim that the intent was before they entered into the contract, acquire this and kill it. So then what is the bad faith and what is, again, to go back, what is arbitrary and whatever capricious about their decision not to create something that would have generated more revenue? I assume they would want to create something that would generate revenue. So what is the evidence that they somehow decided at a subsequent point to just kill you guys rather than to incorporate your technology into something of theirs? Yes, so there's certainly the distinction between what's a business decision that someone would normally make but what's arbitrary, and that exact question is raised by the Tenth Circuit in a field tool case on a very similar transaction. But what is the evidence here? I don't want to hear about the Tenth Circuit. They're far away and in another galaxy, and they don't find us. I want to know what in this record suggests that kind of bad faith. In this record, what was not considered was what position Mr. Landvater would have in order to be able to prioritize the convergence of low-cost 2.0. It was not considered that, and again, this is just like in the other Delaware cases, that JDA was not actually going to prioritize resources for Flowcasting 2.0. But that they did that in bad faith, that they made a... And again, I'm just trying to understand what kind of arbitrary non-business decision this would be. You suggested one was just wiping you off the map as a competitor, but if that's not the motive or if that became the motive at some point, what is the evidence of that or what is the evidence of anything other than a business decision not to do these things? Failing to allocate the necessary resources to do what we believed was going to be best. What you believe, but that's a choice. Isn't it a choice on their part as to how much resources to pour into this? Why isn't there any evidence that that was other than a good faith business decision about what would work and what didn't need to work? Because there's no evidence in the record of why they chose not to allocate the resources. I must say, I don't understand. Even if their purpose was to take a competitor out of the market and offer that competitor in their contract certain things, why that is anything that we can worry about? Maybe any trust, maybe other things, but why does it violate a contract? To buy out a competitor. And I apologize, that is not the focus of the implied covenant claim. The implied covenant claim results from depriving us of our reasonable expectation of receiving the full value of our earn out, which we believed and had reason to believe would be maximum. You keep using the word believe, and I have no doubt that you believe this, but where does your belief find some evidence that suggests that they wrongly fooled you, did something that led you to believe other than that was your role? That's the December 2013 communications, and this is looking at the extrinsic evidence. In December 2013, after the communications the council just referenced involving Andre Martin, JDA recognized they would not get us to sign this deal unless they got alignment on the roadmap. They converged a meeting in December. The email trails are clear. We've got to get them to agree to this. They have the meeting where the parties sit down. They hash out what this is going to mean. When I say I believe, I believe both parties intended when we entered the contract that this is what was going to happen based on those December 2013 communications. Again, this is the extrinsic evidence that I think if there is going to be any consideration of extrinsic evidence, certainly from the moving party, this needs to be weighed by the fact finder and request that you remand for trial on those issues. Thank you. Thank you both. Nicely argued. The next case on the calendar is Dr. Rivas v. Pichot. Good morning, your honors. May it please the court. John Romberg for Seton Hall Law School Center for Social Justice representing Mr. Castorina. In a moment, my co-counsel will give two reasons why apart from the treating physician rule, Mr. Castorina was disabled and unable to work. I will first explain why under the treating physician rule applicable to Mr. Castorina's claim, the same conclusion is required. Under the treating physician rule, if a treating physician gives an opinion about the nature and severity of impairment, if it's well supported by clinical and medical findings, and if it's not inconsistent with substantial evidence in the record, then it's entitled to controlling weight. Here, Dr. Dasa, Mr. Castorina's treating physician, he gave his opinion that Mr. Castorina could not perform the functional requirements of sedentary unskilled work. Dr. Dasa was the treating physician before June of 2009. He'd already submitted a report in June of 2007 describing Mr. Castorina's functional limitations. In June of 2009, he submitted a report. A further report said this is a follow-up orthopedic visit, said Mr. Castorina has been under my care since 2007. There's letters in the record from Mr. Castorina's attorneys in 2007 saying that Mr. Castorina had been seeing Dr. Dasa for several months prior to the 2007 report, and multiple times, three times after June 2009, Dr. Dasa repeated and adopted his prior more detailed conclusions that Mr. Castorina was completely unable to work. His prognosis was guarded and that he simply could not work. In fact, as time went on, Dr. Dasa saw Mr. Castorina between 2007 and 2013. From the time of the very detailed 2009 assessment, over the next year and a half, Dr. Dasa's assessment and very detailed treatment notes showed that Mr. Castorina was getting worse. The prognosis went from guarded to guarded to poor. He took him from being on Vicodin, which is hydrocodone, to Embedda, which is morphine, a more powerful opioid. Everything indicates that Dr. Dasa, as a treating physician, repeatedly gave his well-supported opinion that Mr. Castorina couldn't perform the sitting, lifting, or hand movement requirements of sedentary work. Let's try to be very concrete here because I understood the district court to be saying and the magistrate judge to be saying that, in fact, Dr. Dasa had only seen your client twice, in 2007 and 2009, and gave his opinion on those occasions. Then I understood it to be a fact that thereafter Dr. Dasa continued his treatment. You are saying that that is a misconception because there is evidence in the record that Dr. Dasa saw Mr. Castorina multiple times before 2007 and between 2007 and 2009. Is that correct? Yes. Yes. And there are two arguments. First, Justice, Your Honor, saying that he became the treating physician before June of 2009 and in the alternative, even if he didn't, after June of 2009. Well, that's a separate question, right? So one question, I can see three possible arguments that you could make,  One is, it is simply not true that Mr. Castorina walks into Dr. Dasa in 2007 and gets an opinion about his disability, what he can do and can't do, based on an examination, of course, and then comes back again in 2009 and gets a similar report. There is evidence of treatment in the interim and even before 2007. That's one point. Then the second point, and I guess I want to ask you where I can find that evidence, the next argument is, and even if it were true that those were the only two occasions as of 2009, it's undisputed that Dr. Dasa continues his treatment and he reaffirms his abilities assessment from the past. And then you say, well, he puts him on stronger medication, he does different kinds of treatment, he has a bad prognosis, but is that what you're relying on or is there something more explicit? You know, I stand by what I said in 2007 and 2009. On the second version, he echoes the same language, that he's totally disabled and unable to work, obviously, rather than submitting a third detailed assessment. I understand. And then the third argument that I understood is at issue in this case, and it might be the one that's interesting as a matter of law, which is just academic maybe, is suppose you are the treating physician. What makes you a treating physician? And do you have to be a treating physician at the time of those two evaluations? What you've said so far is that's not even the issue here because he's clearly the treating physician by some later date at which he continues to endorse his finding of disability. But are you also making the argument that even if it were the case, he's the treating physician because he was consulted for treatment at the time that he made this assessment of ability? You have perfectly spelled out the three different ways we win. First, the evidence in the record shows he was the treating physician before June of 2009. The evidence shows on page 119 of the record a previous ALJ said, in determining the residual functional capacity, I consider the assessment authored by DASA on June 8, 2007. So previous ALJ found he was the treating physician for the 2007 report. There's a letter from July 2007 in 316 of the record explaining that Dr. DASA has been treating for several months before June of 2007. Mr. Castorina, on 302 of the record, estimates that Dr. DASA has been prescribing him drugs since 2005 or 2006. So that's the before 2009. Second, on June 12, 2009, when he gives the detailed functional assessment, says this is a follow-up orthopedic visit, says Mr. Castorina has been under my care since 2007, on that day he's unquestionably the treating physician. The commissioner's argument, to the contrary, is that under Monger, a 1983 case, there's a footnote suggesting that a treating physician may not be a treating physician on the first visit or two. As we argued in the brief, the reason that's not controlling is Monger was addressing this circuit's treating physician rule prior to the Social Security regulations governing this case. Under that treating physician rule, there was no requirement the treating physician's opinion be well substantiated. And this court had specifically held it doesn't matter how long the treating relationship is, the only thing that matters is are you a treating physician? So this court, and Monger didn't hold, it said we'd be hesitant to find. But that was under a treating physician rule which gave definitive weight, well-supported or not, to a treating physician. So the court was more understandably hesitant to say you're a treating physician early on. Post Monger, there's no reason for that to be true. The Social Security regulations say now for a treating physician, you take into account the length and nature of the relationship. One slightly different question. I'm not sure how this even bears, but there is some dispute about Colbelli, whether he was a treating surgeon. Now, he wasn't the surgeon who performed the surgery, but isn't it the case also that he was consulted for purposes of evaluation and treatment and he recommended, referred the person who was conscripted for surgery. But he wasn't someone who was consulted as an expert in litigation by the Social Security Administration. Isn't he then a treating physician too? Yes. Yes, Dr. Hirsch and Dr. Colbelli, Dr. Hirsch. All these people are treating physicians. Except Dr. Trenise, who's a consultant. But assuming, let's assume that we agree with you that Dr. Dawson was a treating physician, could you address the government's next argument that the ALJ didn't err in discounting the evidence because it was discounting the defendant because it was inconsistent with other substantial evidence? Certainly. And one brief note is that whether it's well-supported, the government concedes the ALJ didn't find otherwise. And this court's decision in Colgan at note four says, therefore, we don't consider that. So then the only remaining question is whether it's inconsistent with substantial evidence in the record. This court, Dr. Trenise's opinion, and Dr. Hirsch and Dr. Colbelli's opinion. This court in Simmons held that the opinion of a consulting physician who examined the claimant once generally does not constitute substantial evidence on the record as a whole, particularly when contradicted by other evidence and explained, and this is echoed in Colgan, that the consulting physician's opinion's report should be given limited weight. This is justified because consultative exams are often brief, are generally performed without benefit or review of claimant's medical history, which is true here, and at best only give the groups. But to what extent are you arguing that it was error for the ALJ not to give controlling weight, but that the minimal amount of weight that he gave was not justified on this record given all the mistakes that Trevesi made, because of which you can't claim Trevesi's statement to be worth a damn, and the understanding of Colbelli as being something that he didn't do. And under those circumstances, the minimal amount of weight that the ALJ gave to these others as against the treating physician is wrong, even if an ALJ would have been justified in saying this treating physician exaggerated. Right. So yes, absolutely is our fallback position, is given the ALJ's many errors and shortcomings, unquestionably at the very least a remand for a do-over is required. But we are primarily arguing that a remand for calculation of benefits is required under the treating physician rule, and for other reasons my co-counsel will bring up. And the reason is there is not substantial inconsistent evidence in the record. The ALJ points to, the ALJ actually didn't mention Dr. Hirsch, the commissioner does, but Dr. Hirsch and Colbelli are hip specialists who Mr. Castorina saw for his left hip, which was in severe pain. Dr. Hirsch saw him once. Dr. Colbelli saw him twice. Dr. Hirsch has one sentence in the report that basically says, well, his shoulders seem to be a problem. I don't see other problems. But he went to see Dr. Hirsch about his left hip. Dr. Hirsch is his hip specialist. There's no reason for Castorina to bring up, by the way, here's my incredible laundry list of other issues that have nothing to do with why I'm seeing you. The ALJ didn't even mention Dr. Hirsch. Dr. Hirsch's one sentence in which he didn't point out Mr. Castorina's other limitations are entirely insubstantial. Dr. Colbelli saw Mr. Castorina twice. In neither treatment note does Dr. Colbelli say anything other than about the hip. The reason the ALJ said it's substantial and consistent evidence is he said Dr. Colbelli demonstrates that the left hip wasn't a substantial problem even before the surgery. And the ALJ is mistaken there. What Colbelli, on the first occasion, said, I think this may be mild. I'm going to give you a steroid injection and we'll send you for an MRI and come back in a month. Maybe there's a vascular necrosis. But I think this might do it. A month later, he's gotten the MRI, comes back, and Dr. Colbelli says, well, this is a vascular necrosis. You need to do something about it. Suggests he goes to Baltimore to a world-renowned orthopedist. Mr. Castorina says, I think I can find one in New York City that's adequate, gets the hip replacement surgery. And another fallback position, at the very least, between the time of his hip injury and 14 months later when he gets the surgery and when he recovers from it, is a period of at least 12 months in which he's unquestionably disabled and unable to work. But what the record shows is that Dr. Dasa said even after the surgery and before the hip injury, he couldn't perform, he could only lift 0 to 5 pounds. Sedentary, unskilled work requires throughout the entire day lifting up to 10 pounds. Dr. Dasa said he can sit for a total of 1 to 2 hours. Sedentary work requires sitting for 6 hours of an 8-hour day. Dr. Dasa said 1 to 2 hours. Dr. Dasa said with reaching, handling, pushing, pulling, he simply can't do that. He has activity intolerance. He has a severe impairment. He may be able to momentarily do it for a minute or two, but he can't do it throughout the day. And full bilateral use of the hands for at least two-thirds of the work, full bilateral use of the hands throughout the day is required generally for sedentary, unskilled work. There are some jobs that can be performed if for two-thirds of the day, if for more than 5 hours of the day, you have full bilateral use of the hands. But Dr. Dasa said no. He certainly doesn't, maybe briefly momentarily, but he doesn't have the full ability to engage in repetitive, sustained motion with his hands for any meaningful period of time, let alone for at least two-thirds of the day. Each of these findings by Dr. Dasa, as the treating physician, is not contradicted by any substantial evidence. Dr. Trenise, I've explained why Hirsch and Capelli, treating physicians, but very briefly, saying nothing about anything other than the hip and finding the hip to be serious. Dr. Trenise is the only other possible source of substantial inconsistent evidence. And as Dr. Calabresi pointed out, there's many reasons to think that Dr. Trenise's assessment is insubstantial. The general rule from Simmons is you're entitled to very little weight, particularly when you have fluctuating symptoms, as Mr. Castorina did here. Dr. Trenise saw him one day after the date last insured, did not review any medical evidence, in a brief meeting, said, what's going on? Dr. Trenise thought he was right-handed. He's left-handed. Dr. Trenise said he could lift 100 pounds a third of the day and carry 50 pounds two-thirds of the day. He could frequently, at least two-thirds of the day, climb ladders and scaffolds. Dr. Trenise's opinion, based on a very brief meeting, reviewing no medical evidence, is simply not substantial and consistent evidence. Dr. Trenise didn't even know about the MRIs and the surgery on the left hand. Mr. Castorina comes in. He's obviously not feigning anything. He comes in on what was apparently a good day and is in relatively good shape for the 20 minutes, maybe 30 minutes of the investigation. But Dr. Trenise did not have the basis that Dr. Dassa did over six years, over more than a dozen visits, to give the opinion at a treating physician that there simply was not the capacity to perform the skills required of sedentary, unskilled work. Good afternoon, Your Honors. My name is Edwin Adlam Herod, and I also represent Mr. Castorina, the appellant. In addition to the treating physician rule, there are two further bases for remand. The severe impairments of Mr. Castorina's left hand and left wrist, as well as the side effects of his pain medications, which are simply incompatible with Mr. Castorina's alleged ability to maintain unskilled sedentary labor. First, as to his hands, unskilled sedentary work requires good use of both hands bilaterally, and the record has compelling evidence that Mr. Castorina's dominant left hand and left wrist were severely impaired. Dr. Dassa's assessments, Dr. Ford's report, as well as pages of testimony support that conclusion. We respectfully request this court remand this case for a calculation of benefits, as there is persuasive evidence of total disability on this record. For instance, Dr. Dassa's medical reports, Dr. Dassa, a board-certified orthopedic surgeon with expertise in hands, found that Mr. Castorina had severe impairment of his left hand and a severe limitation in reaching, pushing, and pulling. And Dr. Ford found that Mr. Castorina's 2007 hand surgery didn't help, and that he had difficulty moving his left hand still. Additionally, that there was decreased grip strength in Mr. Castorina's left hand. Further, pages of testimony spanning years for hearings before three different ALJs show that Mr. Castorina did not have full use of his left hand. Mr. Castorina was unable to use his left hand to zipper or button shirt. He had to teach himself to use his non-dominant right hand for this regular daily activity. Mr. Castorina could not lift a gallon jug of milk. In fact, he testified that he, at best, could lift a half gallon of milk, and had to use both hands to do so. This court in Celian v. Strew found the testimony that an individual could not carry a gallon of milk to be very persuasive evidence of that individual's inability to use his hand fully. And in fact, the ALJ herself found that Mr. Castorina had a severe impairment, which is defined as significantly limiting Mr. Castorina's ability to do basic work activities. This evidence is backed up by MRIs showing tears of his TFCC with perforation in his wrist, as well as physical examinations of Mr. Castorina's left hand and wrist. Here, there is persuasive evidence of total disability that would render any further proceedings pointless. Yes, Your Honor. Yes, first, Mr. Castorina did raise the issues of the hands, wrists, and the pain medication below. And this can be found in the reply brief on page 28. But further, this court has held, specifically in Celian v. Strew, that as long as the general argument of substantial evidence has been raised before the district court below and before the magistrate, then that preserves the subsidiary arguments that relate back to that substantial evidence argument. And so here, the hands and the wrists all relate back to the issue of substantial evidence. Likewise, Celian found that the duties of the record issue is likewise preserved as a subsidiary argument. Further, this court does have discretion to address those issues. The duty to fill out the record, you argue that should be with respect to Ford. I think there's a lot about that. Are you also arguing that with respect to the hip surgeon, the true hip surgeon, about whom nothing was said? Because we all seem to think that Covello was the hip surgeon when he wasn't. Now, is that the duty to fill out the record that you're addressing? That's correct, Your Honor. Yes. We are stating that because Dr. Stuchin, there was not sufficient evidence in the record to fully, excuse me, if I've misspoken, that if the ALJ failed to find sufficient evidence to review Dr. Stuchin's beyond the report that is in the record that the ALJ should have, following the duty to develop the record, therefore looked into additional information. But of course, because the ALJ mistook Dr. Covelli to be the treating surgeon and didn't address Dr. Stuchin in that case. So that's an error in itself. But whether you cure that error by saying you should have looked at Stuchin is another question. Yes, Your Honor. And that error should have been cured from multiple perspectives, Your Honor. But ultimately, yes, as an alternative, the ALJ should have developed the record around Dr. Stuchin. Thank you. And those reasons, Your Honors, we respect the request that this court remand this case for calculation. One question about Dr. Ford. Does the ALJ have, the ALJ certainly doesn't have any authority to require Dr. Ford to rewrite his old notes in a more legible handwriting, right? No, Your Honor, that is true. There's no reasonable prospect that you could ask a doctor to take notes from several years earlier and rewrite them. And this is not a question of you sent me a bad copy and I can't read the copy. The problem is his handwriting, not his photocopier. Yes, Your Honor, that is true. While the ALJ is unable to compel the doctor, Dr. Ford, to rewrite the notes, the ALJ could Is it a reasonable request to ask the doctor to rewrite his notes? Yes, Your Honor, I think it is a reasonable request, at least in as much as to clarify the notes that presumably the doctor can read his own handwriting, even if the ALJ is unable to. But moreover here, the ALJ didn't even comment on Dr. Ford's report. It's not clear the ALJ even addressed it. As you're saying, it is the very least if you cannot read a report from an important doctor, that asking, can you help me, the person may say no, and that may be fine, but that at least a sensible person says, give me a hand. Yes, Your Honor, that is the case, that here the ALJ should have at least requested for alternative permission. Thank you, Your Honor. Your Honor, may it please the court, the Assistant United States Attorney, Joseph Pantoja, for the commissioner. In this case, the client has raised several arguments,    The second argument is that the ALJ should have three of them were weighed but haven't been raised below. There is no dispute that, although plaintiffs raised the alleged failure of the ALJ to address its pain and side effects and hip and wrist issues and that also failed to properly develop the record, these issues were either not raised in the initial motion to the district court or in the objections to Judge Moses' detailed reporting recommendation. And Judge Nathan, at footnote one of the opinion, in adopting Judge Moses' report, made clear that he had applied clear error to those portions of Judge Magistrate Moses' report that were not specifically objected to, and that waives further judicial review. So first we have either he didn't raise it in the motion to Judge Moses on the report or he then failed to object to the report on the issues that he is now claiming for the first time in appeal. And with respect to the main issue that we feel was not weighed, the ALJ properly weighed the opinion evidence  No, no. You have Das' report, which may well be exaggerated in terms of what some of the other people say. But the ALJ gave dominant weight to Taparese, whose report is manifestly absurd from somebody who, in terms of being consistent, inconsistent with what everybody else said, from somebody who, with respect to the issue as to which arm, even didn't know the right arm. So isn't that error enough, apart from everything else, to say, at the very least, this must be sent down for re-argument? The question of whether there is enough more is another matter. But I must say that the ALJ is relying on this. OK. Let's say, let's ignore for the fact that he's hired by the government, and comes in with something that is totally inconsistent with what everybody else says, and doesn't even know which hand is the right one. Isn't that error enough? Your Honor, I respectfully disagree. The ALJ, for one thing, DASA's overly restrictive opinion was not actually adopted by any other doctor. And the ALJ himself noted various instances in which those clinical findings were at odds with not only his own relatively mild clinical findings, but also the clinical findings and assessments of the other doctors in the record, including Dr. Tremesin. Then he could lift 60 pounds, he could do it. The ALJ ended up not crediting that portion of Dr. Tremesin's opinion. And yet he gives great credit to a doctor who would say something like that. I mean, that just puzzles me. I mean, you know, if somebody is that wrong, we used to say, falsus in unum, falsum in nominum. We don't need to go that far, but there's plenty of falsum here. Your Honor, that aspect of Dr. Tremesin's opinion, with respect to the amount of weight that he carried, is the exertional part of the residual frontal capacity. And the ALJ actually credited Dr. DASA's opinion to the extent that he was claiming that he was actually below sedentary. If Your Honor, if I could just remind Your Honor that the ALJ's RFC capacity determination was for a reduced range of sedentary work, which is the least restrictive exertional category. So considering the fact that Tremesin found that he could do much more exertionally, it is pretty clear that the ALJ actually credited Dr. DASA's opinion in that regard. And then with respect to the other aspects of the ability to work regarding the shoulders and things like that, the ALJ did find some restrictions. With respect to the shoulders, you can't reach overhead with the right arm. You can only frequently use the left arm on the left upper extremity for reaching, handling, and feeling, which again, in light of the fact that Dr. Hearst did not find plaintiffs so limited, and the fact that Dr. Cabelli in his statements of review of symptoms and that only the left hip was symptomatic, and even then he could fully wave here, et cetera, it is clear that the ALJ must have given significant credit to Dr. DASA's opinion, because that is the only opinion that would justify the ALJ getting that low in terms of the exertional capacity that we see in the RFC determination. And with respect to Dr. DASA's opinion, the ALJ reasonably found that it was overly restrictive compared to his own clinical findings, because with respect to the lifting and carrying and limitations that Dr. assessed, his clinical findings on that day in June 2009 included normal right shoulder range of motion and only slightly reduced left shoulder motion and intact neurological findings. And Dr. DASA's prognosis notes from mid-2009 through late 2010, so this takes you after the date last insured of September 30, 2010, there were no clinical findings regarding the hands and wrists. This is throughout the whole time that Dr. DASA evaluated the plaintiffs since the June 2009 opinion and the DLI of September 30, 2010. And Dr. DASA repeatedly diagnosed cervical spine and sprain with respect to the cervical spine and lumbar spine disc bulging that resulted in radiculopathy. But the 2009 MRI of the cervical spine was normal and costa rena only had straight leg raising intermittently. But also Dr. DASA's clinical findings were inconsistent with the functional clinical findings by the other doctors of record. Dr. Hirsch, for example. Yes. Which ones? Yes, yes. Specifically as to the same things that we're talking about or whether we're talking about different types of things. These are so many different things. Yes. Some doctors talking about one and some doctors talking about the other. And then also some confusion as to what doctors did what. So if we're talking about what Covelli said about something he didn't do, that's what, you know. I really don't understand what's going on here. Well, one of the reasons is that the difference in what the doctors were addressing is that Dr. DASA, for some reason, never even mentions costa rena's hip condition in the June 2009 opinion, despite the fact that costa rena testified that he allegedly became symptomatic with respect to the left hip in December of 2008. He first sought treatment in February 2009 and was diagnosed in April 2009 and then had the surgery in January 2010. Yet Dr. DASA's 2009 opinion makes no reference to the hip condition and his progress notes after that only reference that costa rena had surgery in January 2010, but then doesn't note any complaints. When this is supposedly the main issue that kept costa rena from being able to work, he testified that, in one of the hearings that he had, he testified that it was not until December 2008 that he had the left hip problems and that before that he was fine. And then just like that, all of a sudden, because of the left hip problems, he could no longer dance and everything changed. That's what he testified to. Now... Can you just answer me why one shouldn't get the very least, get more information from the hip surgery? Well, for one thing, with respect to Dr. Stukin, that progress note in November 2011 was more than a year after the date last in short. And there is nothing to suggest, one, I mean, the plaintiff hasn't shown that that progress note of November 2011 was necessarily inconsistent with the ALJ's RC determination. Second, there is no indication that that November 2011 progress note, whatever it noted, related back to prior to the date last in short. Isn't that a situation in which the ALJ has some duty to find out what happened in this hip surgery when the ALJ thinks it's a different surgeon who wasn't really talking about it and he could find out who he said they said would need to correct it. You know, I'm inclined not to go that far on Dr. Ford and say that we should push, but Dr. Stukin at the very least, you know? It is true that the ALJ misidentified Dr. Kobeli as the treating surgeon. He is an orthopedic surgeon, but Dr. Stukin was the one who performed the surgery.  that it was the ALJ's prerogative to find castorine functioning from his alleged onset date through the date last insured, and that was more than a year before Dr. Stukin's progress report. And there is no indication, and certainly plaintiff hasn't carried the burden, of showing that Dr. Stukin's progress report was actually inconsistent with the ALJ's RC determination, let alone that it related back to prior to the date last insured. But going back to your honor statement with respect to what did the other doctor say about the functionality of castorine, Dr. Das' overly restrictive opinion was in June 2009. Just a few months before that, Dr. Hirsch, who is a colleague of Dr. Kobeli, found that he only had left hip pain, and that the other systems, the shoulders, the knees, et cetera, were all essentially unremarkable. So Dr. Hirsch did more than just review the left hip complaint in February 2009, contrary to what counsel said. They looked at other things. Same thing with Mr. Kobeli. He said there was a review of symptoms. But only the left hip pain was an issue. You're saying that the question of medication was waived? Yes. Yes. It was waived because it was specifically... Yes, yes. Yes, and it was only Dr. Dasa who found muscle atrophy, swelling, spasm, or trigger points with respect to castorine. No other doctor did that. And Dr. Hirsch noted, as I mentioned, that castorine had good movement and function of the hands, the wrists, and elbows, as well as the right shoulder. This was all within the date last insured, as opposed to castorine's reference on progress notes by Dr. Stukin more than a year after the date last insured. And the progress note that that before, with respect to the hand and wrist, months after the date last insured, which again, have not been shown to be necessarily inconsistent with the ALJ's RFC determination, or that Dr. Ford had made statements that relate back to prior to a DLI. The duty to recontact a physician... Sorry, let me rephrase that. The ALJ's duty to recontact a physician does not arise unless the ALJ has insufficient information upon which to evaluate the doctor's findings. It is not triggered, as in the case here, by a doctor's opinion that is inconsistent with his own medical findings and inconsistent with other substantial evidence of record. So counsel has simply misconstrued what the duty is in terms of recontacting a doctor when there are inconsistencies in the opinion, either with his own clinical findings or with other evidence. I'm talking about duties to fill out the record. Right. There are gaps in the record. In this case, Your Honor, if I may, there is no dispute that the record was complete through the date last insured. There are no gaps. What counsel is arguing is that the ALJ should have access to information, documents, and other opinion from doctors that treated him after the date last insured in the hope that they could shore up the deficiencies that the ALJ found with respect to Dr. Das' opinion, being that the record simply did not support those overly restrictive assessments. That is not what the duty to develop the record requires. It was Plaintiff's burden to show that he was more restricted than the ALJ had found. And Plaintiff has simply not carried that burden in this case. Just one more thing here. With respect to the waiver argument, I just wanted to note that counsel relies on selling, but totally overlooks a holding of selling that was more apt to this case. In selling it, the court found that the plaintiff had waived any argument that the ALJ had not properly evaluated his testimony regarding the credibility of his testimony regarding pain. So selling actually supports the waiver argument here. And then we have Popori, this court's decision in Popori, where the court found that a claimant must present, in a counsel case, in a social security case, at least where the claimant is represented by counsel, the claimant must present the relevant legal arguments in that form in order to preserve them for the appeal. And then we have the case in Wersen. It's a summary order that this court issued. Wersen, 726 Fed Appendix 839, going toward the argument of whether the ALJ had properly developed the record. In that summary order, this court noted that the contention that the administrative law judge had a duty to recontact a treating physician was waived. It's a summary order. I'm sorry? It's a summary order. Yes. But I just bring that to the fore to note that this court has addressed a record development issue and found that it was waived because the duty to contact the doctor, that issue is a record development issue. And so counsel's argument in the reply brief that there's somehow a distinguishment here based on the fact that the ALJ has an affirmative duty to develop the record, that doesn't change the analysis here with respect to waiver. He either presented the argument sufficiently below and he had two chances on his motion and then with the objections to the report and recommendation and it was not raised properly either in one or the other. So, Your Honor, oh, and just one final thing. With respect to remand for calculation of benefits, sorry, payment of benefits... Yes, you can address that point briefly. Yes. Sign in. Yeah, in this case, despite the fact of the long delay, which we do not dispute this case that's been around for a while, the delay was not the agency's fault and the agency counsel has not established that. It was only recently, the prior remand, that the full adjudicated period was actually addressed because there was a problem with the date last insured  In fact, it was the appeals counsel that noted in the last adjudicated period that the date last insured that the date last insured was incorrect. So this case has only gone back once where the administrative law judge has actually addressed the full adjudicated period. And in this case, for the reasons explained by the administrative law judge, the application of the correct legal principles does not mandate a conclusion that the commissioner cannot carry its burden in showing that there's work that plaintiff could perform And therefore, remand for just for payment of benefits is not the right course. It should be remand for further proceedings if the court were to find that there was reversible error, which of course we argued that there was none in this case. If Donna has no further questions, we'll rest on it. Thank you. I'd like to focus on why there's no need, and it would be improper and unnecessary to remand for a do-over in development of the record because this record demonstrates that Mr. Castorina can't work, including on the commissioner's burden to show that there's sufficient jobs in the national economy. The commissioner acknowledges that the ALJ credited Dr. Dasa as to the observational capacity of lifting. Dr. Dasa said zero to five pounds occasionally. Sedentary work requires lifting 10 pounds throughout the day. The ALJ credited that, and the ALJ doesn't say otherwise, says it can do sedentary work. Sedentary work requires lifting 10 pounds constantly throughout the day. Dr. Dasa says zero to five pounds occasionally up to one-third of the day. Can't do sedentary, unskilled work. Second, Dr. Dasa says he can sit for one to two hours, not for six hours. Can't do sedentary work. As to the use of the left hand, and the waiver, if it exists, goes to beyond the treating physician rule. But Dr. Dasa says Mr. Castorina simply can't use his left hand to perform the repetitive, sustained motions required of sedentary, unskilled work. Dr. Trenise said he can do it for two-thirds of the day. He can fully use his left hand. The ALJ agreed with Dr. Trenise. There's simply no way on this record. Dr. Trenise was, again, a one-time consultant, didn't consult any medical records but specifically asked Castorina, what's going on with your left hand and wrist? Castorina said, I don't know my diagnosis. Dr. Dasa talks about the perforation of the TFCC, the ganglion cyst, the tear of the scapulate ligament, talks about the problem with the ring finger, says that the flexion and torsion of the wrist are inadequate. I don't know whether those are rather mild clinical findings. Neither does the ALJ. The same way Dr. Dasa does. In order to overcome Dr. Dasa's sense that he knows enough from the MRI, from his observations, that Mr. Castorina can't meaningfully use his left hand, let alone for two-thirds of the workday, there simply is no way to read this record to conclude that he can lift 10 pounds throughout the day, rather than what Dr. Dasa said, that he can use his hand fully for six hours throughout the day. Thank you. Your Honor, two points on rebuttal. Dr. Dasa is the treating physician, and as my co-counsel has pointed out, Dr. Trenise does not constitute substantial evidence in the record. But even looking to Dr. Trenise's report about Mr. Castorina's hands, Dr. Trenise found that he can lift 10 pounds throughout the day. Dr. Trenise found that Mr. Castorina was still limited into the use of his left hand, only as much as frequently during the day. But Dr. Trenise did not have MRIs. He did not review the medical history. He didn't even take medical history, by the record, from Mr. Castorina as to his hand. Further, Dr. Trenise misunderstood that Mr. Castorina's right hand was his dominant hand. While it's actually his left hand, which is the disabled, impaired hand. And so that alone makes it so there's not substantial evidence on this record to find other than Mr. Castorina's left hand was severely impaired and could not be used. He did not have full bilateral use of his left hand. And based on the vocational expert's testimony, his statement in 2013, without full bilateral use of the hand, Mr. Castorina could not do sedentary on-skill work. Moreover, as to the waiver issue, the commissioner states that we've waived the, Mr. Castorina's waived the issue of the pain medication. But the commissioner himself, the commissioner herself raised this issue before the district court. And let me point you to, in the R&R, there's a discrete section discussing the pain issues. That discrete section did not exist before the district court. Mr. Castorina did bring up issues related to the pain medication before the district court, specifically symptomatic pain relief and pain management. But moreover, Mr. Castorina raised the issue that the effects of this medication was that he could not drive. And these are known effects of Vicodin, of Percocet. It inhibits a person from driving to work. The commissioner, in their reply brief to the objections, specifically stated it took issue with Mr. Castorina's ability to drive. And this is on ECF 34 at five. And that relates back to Mr. Castorina's argument at ECF 22 at 25, that Mr. Castorina couldn't drive using narcotics. And so for that, even alone, that preserves this issue before this court. Thank you, your honors. Thank you all. And we'll take the matter under advisement. Thank you, your honors. We appreciate you have consented to be involved in this matter. The next case is Moore out of the New York City Department of Education. Good morning, your honors. My name is James Moore. I'm the pro se litigant in this case. I appeal to this court to reverse the decision of the district court, which is based on race discrimination. I stand here today still a strong teacher at a charter school in Brooklyn. There are no issues at my current school, which I currently have experienced over the last five years. I was hired in regards to this current case in 2016-2017 school year. At the time where the not a good fit comment was made, I was at a school in the Bronx, New York. The entire administration of that school was African-American and or Haitian-American. The entire student body was also minority students, African-American and or Hispanic-American. I met this principal at a job fair not too far from here, and the Board of Ed said to branch out to other boroughs in terms of the best chance of getting a job, which is what I did because I had no prior experience as a teacher at the time of this. So again, there are similarly situated teachers that I mentioned in my case. Mr. Mauro, I have a question. There was an assault. It was after that assault that the statement about you're not a good fit was made. And after that, the negative things were put in your record. But we don't know anything about that assault. What happened? What was it? I find it very hard to understand what people have said without the context of that. Now, if it isn't in the record, maybe it isn't in the record. I wish I could know what happened. Well, another student came into my classroom who was not my student. He asked to leave. He threw a little tantrum. He was escorted out. There was an investigation by the school, and they determined he was at fault. But he was not a student in your class? Well, he wasn't on my roster, no. I'm sorry? He was not on my roster. But after that is when they determined that he was not a good fit, which was then later said at the hearing, at my discontinuance trial, I guess, whatever you want to call it, with the actual appellees. I was found to be not liable for that assault. I mean, then again, what am I going to do? But I wondered whether that incident was an indication of a young teacher's incapacity to control the class, which is a very different thing. If you're telling me that this was somebody who came from the outside and had nothing to do with that. Yes, it was not on my roster. It was clarified. There was nothing. I was found, you know. But before that, things were said by the principal. It was just constantly building. And again, even if a young teacher like myself, who I still terminated, which is what the next part was, probationary discontinuance is a top standard. There are a lot of other circumstances that for me to explain would take too long between the state education law, the union law, and the chancellor's regulations. There's a lot to do in terms of how I'm actually discontinued. So again, after that, I received two letters to file for potential wrongdoing. It was a fire drill. The principal claimed that she saw me through the window, which I mean, it's clear. I didn't know what to look through it. But then again, I also had two more observations after that, which were barely in the ineffective range. As the appellees said in their case, any disprobation on a teacher can be discontinued for any legal reasons or no reason at all. And no reason at all, it's like there has to be a reason. I mean, there were reasons. She said at the hearing, it's on tape, she actually said not a good fit as the main reason why. It wasn't the letters in the file. It wasn't her ineffective ratings. It was that. It was. Over time, but I have a question, so let me ask if you can answer it nevertheless. You were going to address the proposition that there are other similarly situated individuals who are treated in this way. And I wanted to ask specifically about the two drills. Are you saying that the complaint says, or you made the allegation, that there were other teachers in the hall who were not cited for being out of place during the drill? Yes, three were not. Two were African-American and one was Filipino-American. And me and another teacher who were both white were cited for the exact same reasons on the exact same days. And also, the co-comparators that I said were let go, one was Asian-American. Another teacher who was African-American was actually still at that school, or was, I don't know if he still is as of today. But they were eligible for discontinuance and were not. I was. They gave us four years on our probation. That was after one year. I don't understand the story of the drills and why the other people on the corridor were similarly situated. The complaint doesn't say about the door frame. Yes, she said she could see me through the door. I would say they needed to build a case to get rid of me, because, you know. Well, I don't understand the fact. I thought, you said today it was a fire drill. It's not an active shooter drill or something like that? No. I don't even know where it was. Sorry. I'm not a fire drill. An active shooter drill. Yes. For soft lockdown. Do I understand correctly that the idea is everybody's supposed to hide in such a way that they can't be seen from the door? Correct. Yeah, and I was in the back. I was kind of hiding. But, I mean, she kind of looked through and whatever. But the other. She said she didn't. What is the basis for thinking that the other people were not hiding? I mean, she needed a case against me, and that was the easiest thing. I mean, what I. But, I mean, you are saying that there were other people. Yes. Who were similarly situated. But similarly situated in what sense? Were they. Are they all teachers? They were eligible to be sighted like I was. Well, but. But why? I mean, if it's one. You know, if somebody is. If two people violate the same rule and one of them gets terminated and the other one doesn't, that's one situation. But I don't see any real allegation that the other people did the thing that you were accused of doing. You're just saying that's false? That there's a false allegation that you could be seen? I assume so, yes. I mean, it was practice. It was. No, but explain to me. Are you saying that you could not be seen? I was saying, yes, I could not be seen. Or are you saying that they also could be seen? Which of these two? I could not be seen. I was in the back. I was behind my desk. You know, it's. Pretending there's a gunman in the building with the school, and obviously the mindset is to hide until the gunman passes the classroom. So everyone remains quiet and they could just move on. And I was in the back. I don't know how else I could have hid. It was an older school. There were some closets that were locked. There were desks. They hide under your desk. And the lights were off. And she claimed she saw me. I don't know if she did or didn't. I mean, it's a clear doorway. You could say anything you want. But what I'm trying to say is, that was after the not a good fit was said. And she needed a case against me. Like I said, I had no absences. I had no other thing to get me on. And I needed a case. And this was going to do it. May it please the court. Kate Fletcher for the appellees. I would like to just point out the lack of allegations in this case. And the simple fact is that Mr. Morrow has not presented any factual allegations that can reasonably support an inference of discrimination, which is a necessary element to his claim. Excuse me. The not a good fit comment is essentially a neutral comment. And without any kind of additional context to create... Why is it neutral? In a situation where he is the only white person to say you do not fit. Why isn't that, and haven't we in other cases suggested that something like that suggests race? I would argue in this case, it's similar to UCSD-Vassar College, where it was found that it was insufficient to raise an inference of discrimination based merely on the fact that the other people were white and the plaintiff was Bengali. And the simple fact here is that there is no racial connotation to that statement. It came after a disruption in the classroom. It is unclear exactly what happened because those facts were not alleged in the record. But we have been very clear that the premontation case is a very easy case. I am really more interested in whether there were reasons for firing or for not keeping that are not predictable. In many of these cases, we either say there is a prima facie case or arguendo that it is a prima facie case and then we look to the other reasons. So I'd like you to give me some ground for saying that what happened was not predictable. Well, in this instance, Mr. Morrow was cited on two occasions for violating the active shooter drill procedures, which is a safety issue in the school. In addition, he received ineffective ratings on two occasions. He was also looking at the active shooter drill. The complaint alleges that another white teacher was similarly cited and that the complaint was not drafted by a lawyer and that there were other teachers who were also in the hall but who were not cited for this infraction. So I read the complaint as attempting to say there were some similarly situated people who were not cited and another person who happened also to be white was cited, and this raises some inference of discrimination. I understand that this is a minimal burden, but we still have to raise some sort of factual allegation to support some sort of inference of discrimination. And in this case, the mere fact that Dave were non-white and in the same hallway is not an allegation that Dave himself violated the procedures of the active shooter drill. He didn't allege that Dave violated the active shooter drill. Even on information and belief, that allegation was never made. So it is not reasonable to say that they are similarly situated in all material respects where there is no even... ...who has had multiple opportunities even after a motion to dismiss where all of these arguments were raised he had multiple opportunities to amend and to correct the pleading deficiencies. I understand this is a per se plaintiff and they are afforded solicitude. However, again, he had the opportunity to simply allege upon information and belief that he believed these other teachers had also violated the safety procedures. There is no such allegation in the complaint after two opportunities. He supplemented his original complaint on two occasions. It is a different argument. It's one he has not made before. It's one that he did not allege in his brief in front of this court or below in the district court. And I would say that there is no basis to say that the principal was lying in this case. According to what he has just said, which is new information, the principal looked through the doorway and could see him and that was a violation. He said that he was sort of hiding before you today, which is not the same thing as actually hiding. But I think more critically is that this is the first time he has made any allegation that Principal Guillaume falsified her reports that he violated the active shooter drill. So that claim is not argued before this court and is being made now for the first time on oral arguments after he had an opportunity to even raise it on reply, which he chose not to use, after he had an opportunity to raise it in his opening brief, which he chose not to do, and had multiple occasions in the district court to raise that allegation. And it is simply not here. And that is the nature of this case. There are a lot of allegations that minimally could have supported his claims. But they are not here. They are not made. And the fact that there is no factual basis to support an inference, even a minimal inference, even a minimal factual allegation. Can you tell me what you don't fit means, what it can go to? I think you don't fit. For example, he alleged, he made the other allegation that the principal thought he was a young teacher who should be teaching younger students. That is an example of a way in which he did not fit in the classroom that he was in, in the school at the level he was teaching, that is completely race neutral. It has nothing to do with anti-white bias or anti-white animus. It is simply a fact that you can say, especially after a situation in which you are unable to control your classroom, even if the person was not a student who was supposed to be in the classroom, to say, you're not a good fit. That's why I asked if the person was in the classroom, then I can understand very well somebody who comes out of the classroom doesn't tell you much about whether a young teacher can control the classroom. Again, the allegations that were made in the district court and before this court in briefing are quite minimal as to the specific circumstances of that incident. So what we know is that there was an allegation of some sort of an assault and we know that there was a classroom management issue and we know that that statement was made. But beyond that, there is nothing to suggest a racial overtones or bias in this case and the plaintiff simply has not met the minimal peeing standards. Thank you for your time. Tomorrow we have one minute of rebuttal. Okay, yeah. Like I said, there was also a hearing in which their people said there was no legitimate business reason for this to take place. Even if all that was true, it kind of is true or not true, but there was no reason for this. I had four years. I think every teacher in the world has trouble with classroom management. The not a good fit comment was made multiple times. It was made in the actual hearing for everyone to hear. You could say it was a hostile work environment even after I was terminated. However you want to see that. I'm just asking to have discovery here flush this out of whether people were cited. I don't know. I don't have access to their records. I truly don't know if they were or weren't. Same thing with everything else here. I don't know. Similarly situated, if Ms. Zebo or the person I mentioned were tenured, they wouldn't be and I would guess that would be wrong, but I don't know and they just keep throwing with the standard. In that lockdown, I don't know what happened. It was practice. It was practice for what was happening and I have not seen what happened. For instance, if I got terminated for being excessively late or the chances regulation showing up late under the influence, whatever it is, I can't argue that. It's a fact. This is practice for a drill. Plus the union said I can't refute that. They scrapped it. I don't know the union law. I couldn't argue that. All I could do is put in something and say I disagree with this and that was it. The union law, like I said, there's a lot going on here. Hypothetically, if she didn't discontinue me, I would be guaranteed my job back based on current laws and there's a lot of laws. City laws, union laws, city laws. The best way to get me out of that school was to do this and it's a mark on my record. I get that and things change. There's a lot. I'm just asking to maybe get some more discovery to flush these things out. Thank you both and we will take the matter under advisement. That is the last case to be argued on the calendar this morning. So I will ask the deputy to adjourn. Quiet please.